| 20 | 631 |
| 30 | 107 |
| 31 | 450 |
| 31 | 790 |
| 20 | 631 |
| 35 | 691 |
| 35 | 698 |
| 20 | 631 |
| 43 | 558 |
| 20 | 631 |
| 49 | 506 |
| 55 | 443 |

FULLER & JOHNSON, PLAINTIFFS IN ERROR, v. J. C. SCHROEDER, DEFENDANT IN ERROR.

1. **Appeal:** TRIAL. An action appealed from the county court to the district court must be tried on substantially the same issues as were presented to the county court, unless some matter, such as payment, release, etc., has arisen since the former trial.

2. ———: ———: PLEADING. Where change of cause of action does not appear on the face of the petition, it may be set up by answer.

3. **Evidence** examined and *Held* insufficient to sustain the verdict.

4. **Sale:** PRIVILEGE OF USE. Where a reaping machine was sold with leave to test the same by using it for one day, *Held*, That

the word *day* is to be understood with reference to the usage of farmers in working with such machine.

5. ———:  WARRANTY.  Where a machine was sold conditionally, and notes given for the purchase price, which notes were to be returned in case the machine failed to comply with the warranty, *Held*, That the return of the machine, if properly made, was a sufficient demand of the notes.

ERROR to the district court for Butler county.  Tried below before POST, J.

*Myers, Evans & Steele*, for plaintiff in error.

*W. H. Fuller* and *Billingsley & Woodward*, for defendant in error.

MAXWELL, CH. J.

The plaintiffs allege in their petition "that on July 16, 1882, said plaintiff conditionally purchased of defendants a Walter A. Wood harvester and binder under an express warranty made by defendants, a copy of which warranty is hereto attached, marked 'A,' whereby defendants warranted said machine to be made of good material, and capable of doing first-class work in cutting, binding and saving grain—that being the purpose for which said machine was intended—and that the plaintiff was to have one day in which to give said machine a fair trial, and if said machine did not work properly, then, and in that case, said plaintiff was to notify the agent of said defendants of the defects of said machine, and if the agents of the defendants could not, and did not, remedy said defects and cause the said machine to work in a proper manner, then, and in that case, this plaintiff was to return the said machine to said defendants.  That said plaintiff, after giving said machine one day's trial, and the said machine wholly failing to do the work which it was warranted to do, to-wit: cut, bind, and save grain in a satisfactory manner, said

plaintiff notified the agent of said defendants that said machine would not work as represented. The said agent failing to remedy the defects, or to so adjust the said machine that the same would work in a satisfactory manner, or in the manner which it was warranted to do, and the said machine being wholly worthless for the purpose for which it was intended, and for which plaintiff purchased it, and of no value whatever to the said plaintiff, the said plaintiff returned said machine to the agent of said defendants, and demanded a return of the money and notes that he had paid for such machine, which said money and notes said defendant's agents refused to so return.

That said plaintiff, in payment for said machine, paid to defendants the sum of $50.00 in money, and executed and delivered to said defendants his promissory notes to the amount of $262.50, payable at different times and dates, the exact dates of the several payments being unknown to the plaintiff. That when said plaintiff returned said machine he was entitled under the terms of said conditional sale to a return of the said sum of $50.00 in money, and also to the return of his promissory notes to the sum of $262.50, but defendants refused to so return them, but retained the same and converted the said money and the said notes to their own use. That said notes drew interest at ten per cent from date, whereby defendants become indebted to plaintiff in the sum of $50.00, with seven per cent interest from July 16, 1882, and $262.50 with ten per cent interest from July 16, 1882."

The following is a copy of Exhibit "A":

"ULYSSES, NEB., June 16, 1882.

"Whereas, J. C. Schroeder has this day given his order for one 6½ foot cut harvester and binder. Said machine is warranted to be well made of good material, and capable of doing first-class work. Purchaser shall have one day to give it a fair trial, and if it does not work, shall give

notice to G. Babson, Jr., and allow him to get to it and remove defect, and if it then does not work well, it shall be returned free of charge to Ulysses.

"G. BABSON, JR., Agent."

Defendants below (plaintiffs in error) filed the following answer :

"1st.    Come now the defendants, and for answer deny each and every allegation in said petition contained, except such as are hereinafter admitted.

"Admits the sale of the machine. The execution and delivery of the warranty, and that the contract price therefor was as alleged.

"Defendants allege that said machine was in every respect as in said warranty it was represented and agreed, both in material, workmanship, and capability of doing the work for which it was in said warranty intended and sold.

"2d.    For further answer defendants allege that said action was brought into this court by appeal from a judgment rendered by the county court of Butler county, Nebraska, against defendants and in favor of plaintiff, and that the petition of plaintiff was filed herein in the prosecution of said case so appealed to this court by defendants.

"That said action so tried in, and appealed from, said county court, was an action on an account for money had and received, as shown by plaintiff's bill of particulars as therein filed, a copy of which is attached hereto, marked Exhibit 'A.'

"That defendants answered said bill of particulars in said court by general denial, a copy of which answer is attached hereto, marked Exhibit 'B.'

"That upon the issues thus joined in said county court the said cause was there tried on January 3, 1883, and a judgment therein rendered against defendants for $362.50 and costs.

"That defendants duly appealed from said judgment to

this court by filing their appeal bond within time, and having the same approved and the appeal allowed, and by filing a transcript at the proper time in this court, and having the said cause docketed as required by law. And on May 15, 1883, this court entered an order requiring plaintiff to file his petition in said cause within sixty days from that date. And on July 13, 1883, said plaintiff filed his pretended petition in said cause, to which the court sustained a general demurrer. And on December 19, 1883, plaintiff was granted permission to file an amended petition in said action so appealed as aforesaid. And on January 3, 1884, he filed his amended petition, in which he sets forth, substitutes, and pleads another and entirely different cause of action from the one plead, tried, and brought to this court by appeal in and from said county court as aforesaid, and fully abandons said cause of action so as aforesaid tried in and appealed from said county court, which said cause so appealed to this court is the sole and only action pending in this court between said parties. That said amended petition states only as a cause of action an alleged breach of a written warranty, which will more fully appear from said amended petition, to which reference is made as a part of this answer.

### "EXHIBIT ' A.'

" The plaintiff complains of the defendant for that on July 16, 1882, defendants were justly and truly indebted to plaintiff in the sum of $312.50, for money had and retained by defendants to and for use of plaintiff.

" Said defendants have not paid the same nor any part thereof, and there is now due from defendants to plaintiff the sum of $312.50, with interest thereon from July 16 1882.

### "EXHIBIT ' B.'

" Comes now said defendants, and for answer to plaintiff's petition deny each and every allegation therein named and ask for proof."

The plaintiff below (defendant in error) demurred to the second count of the answer upon the ground that the facts stated therein were not sufficient to constitute a defense, and the demurrer was sustained.

In this we think the court erred.

An appeal from the county court to the district court necessarily brings up the case for trial in the district court upon substantially the same issues as were presented in the county court, unless some matter has arisen since the trial, such as payment, release, etc.   *O'Leary v. Iskey*, 12 Neb., 136.   *U. P. Railway v. Ogilvy*, 18 Neb., 638.

The rule is admitted by the attorneys for the defendant in error, but they say that the remedy of the plaintiffs in error was by motion to strike the petition from the files, and that having filed an answer in the case they waived the defect.   Where the objection is apparent on the face of the petition, a motion to strike from the files would be the proper remedy ; but there are many cases where the objection can be made available only by answer.

The petition in the county court may have been inartistically drawn, and did not fully state the cause of action, as in many cases in that court the pleadings are not prepared by attorneys; but in the district court, where greater care is required in pleading, the cause of action is more accurately set forth.

If the identity of the cause of action is the same, the rule is not violated.

The second count of the answer, however, alleges that said action "was an action on an account for money had and received."

If that allegation is true, the objection in the second count of the answer to the petition was well taken, and the demurrer should have been overruled.

2d.   On the trial of the cause the jury returned a verdict in favor of the plaintiff below (defendant in error) for the sum of $399.12, upon which judgment was rendered.

The material errors assigned will be considered in their order. *First*, That the evidence is not sufficient to sustain the verdict.

The testimony tends to show that the defendant in error purchased the machine in question on the 16th day of June, 1882; that on the morning of the 15th of July, the agent of the plaintiffs in error set up the machine, and on the afternoon of the same day the defendant in error commenced cutting a piece of barley. There is testimony in the record tending to show that the barley was somewhat uneven in height, some of it being of ordinary height and some quite short. The defendant in error concedes that there were two spots in the field where the barley was very short, and the only variance in the testimony upon that point was as to the number and extent of such spots. There is testimony from which the jury might find that at least a fourth of the field consisted of such spots of short grain. That the machine did not work well at first seems to be conceded, although there is no claim that the fault was in the material or construction of the machine.

A. H. Skinner, who was in the employ of the agent of the plaintiffs in error, on his direct examination testifies as follows:

" I set up the machine for plaintiff and partially started it. When we first went into the field it missed a few bundles; it was not properly adjusted. That was July 15th I had the machine almost right when Cooper came, and I turned it over to him. It didn't bind well at first, and would bind two bundles together. That was owing to two reasons. The needle didn't throw quite far enough, and I lengthened that out and then tightened the tension. That is all it needed. After Cooper came I staid while they went round two or three times. Cooper stopped it from binding bundles together. It only bound them together once after Cooper came, to my knowledge. He tightened the tension and stopped that. It might have thrown

off one or two unbound bundles after Cooper came, but I
don't remember of any. I think the machine did good
work. That was a pretty bad field to run a machine in, on
account of the grain being uneven. There was places in
it where it was not over six, eight, or ten inches high, and
it is difficult to do good work in a field of that kind. I
should think one-quarter of the field was short grain.
Where the grain is short the head will be taken in with
the knotter and make more than it can handle. Any ma-
chine would fail to bind in that case. The tension has to
be properly adjusted in all machines. Plaintiff was not
satisfied with the machine at first, but after Cooper had
been there awhile Schroeder expressed himself as being satis-
fied with the working of the machine. When I was about
to leave, Schroeder said he thought it would be a good idea
for me to stay and learn from a man who knew how to run
a machine, as he had got that to running all right as soon
as he came."

J. A. Cooper, who was traveling salesman for plaintiffs
in error, on his direct examination testifies :

"I adjusted the machine sold to plaintiff in 1882. I
got there about two o'clock; the machine had been started
and Skinner seemed to be adjusting the needle when I got
there. When I got there it would sometimes bind two
bundles together; it lost three or four loose bundles by
the grain being too short. The long way of the barley
field was east and west. Both of the east corners were
very short, and the center of the field was short; in fact
it was a very spotted field; barley was better on high
ground than low ground. I thought it had been wet in
the spring and made it uneven. That machine would bind
grain down to twelve inches, and above that length if
properly handled; would bind short as well as long grain.
There is a crank just back of the operator as he drives, by
which he can throw the binder back and forth and get the
center of the grain whether it is long or short. If the

grain is short and you fail to throw the binder back the grain comes between the binder and knotter and will fall out unbound. That was sometimes the cause in this case, because the driver seemed to be tending more to his horses, as there was four of them, and he didn't throw the binder back and forth.

" I showed plaintiff how to operate that. He didn't seem to pay much attention to it. He very seldom tried to adjust the machine for short grain. The reason there were two bundles tied together was because the tension was too loose, and for that reason the knife failed to cut the string after binding the first bundle. I explained everything to plaintiff. I asked him to get down from his seat —he was driving the machine—and I would explain to him how to adjust the machine; and he said it was like any binder; and I asked him again to get down, but he didn't, and I gave the explanation where he was sitting. I don't think he learned anything, or very little about it, because he could not see. I tried to show him why it bound two bundles together. I showed him the lever to adjust the reel and sickle for long and short grain. He used these conveniences but very little while I was there. The machine did very good work while I was there. It did the poorest work in the short grain. The band being so near the top, by not adjusting the binder, that they fell out loose, leaving the string on the ground. That would have been bound outside of the extremely short grain had the driver properly adjusted the machine for short grain. The adjustment of the tension and knife very materially affected the binding of the machine. It depends upon the condition of the grain as to dampness and ripeness as to the condition of the tension.

" I examined that machine after it was brought back and found no defects in it. Think I would have found them had there been any. Plaintiff found no fault with it after I adjusted the tension, when I first went there. He said

if it would bind that way it would be all right. When Schroeder brought machine back I went out with him to look at it. The tension was very loose, and for that reason it would not have bound properly without adjusting. Plaintiff then told me he had made other arrangements, and didn't want to keep it if it did good work, and he didn't want to see it work. Think Reynolds and Malone were present at that time. I then asked plaintiff to go with me and put the machine in another field and give me an opportunity to show him that the machine was all right and capable of doing good work. He said he didn't want to see it do good work, and wouldn't take it if it did, as he had already made other arrangements. I think with proper management the machine would have done first-class work. I think an ordinary farmer, by paying proper attention, and doing as requested, could have learned to adjust and run it so as to do good work. I tried to instruct him fairly, but it is hard for a man to talk when he does not get any attention."

G. T. Reynolds, who was in the employ of the agents of the plaintiffs in error, on his direct examination testifies as follows:

"I saw machine work in plaintiff's barley. The grain was very uneven; fair height on west end. On east end of field it was shorter, and in center and north side it was very low; some so short that it never headed out at all. About one-third of it was short, less than twelve inches high. The machine did good work on going over ten inches high. I was at plaintiff's field on July 17, 1882. I went at plaintiff's request, and told him I was not an expert, but could send him Mr. Cooper the next morning. He said that would not do, as his grain was going into the ground. I told him I would go, but reserved the right to send Mr. Cooper there, in case anything was wrong with the machine. The machine did first-class work, and plaintiff expressed himself as satisfied with it. I fixed

the knife, and Mr. Schroeder complimented me for fixing
the machine so quick. It was cutting the cord off too
quick when I went there, and for that reason did not bind
good. That was all the trouble except the tension needed
a little adjustment. The knife was an adjustable one. I
was there most of the afternoon. No trouble with the
machine after we started it. The machine was capable of
doing and did first-class work. Hulbert drove the ma-
chine while I was there. The machine was hauled back to
my office or left in the public square in our town. I never
took possession of it. The machine missed binding a few
bundles that afternoon, and I showed plaintiff that it was
done by pieces of grain dropped into the knotting appara-
tus, crushing the berry and making the string slick. I
told him it would bind the next bundle, and he said, 'I
like that;' that his old binder, when it missed one bundle,
it would not bind another until it was stopped and fin-
gered with. He said, 'I see this machine does not have
to be fingered with every time it misses a bundle.' The
machine bound two bundles together once. I tightened up
the tension and that remedied that. The string was too
loose, and could be fixed by tightening the tension. It did
not do it any more. I examined the machine in question
and found no defects in it. I would have found them if
there had been any. We cut one line through oats. It
missed one bundle before we got tensions adjusted for oats.
Then it bound the rest. It did good work in the oats, and
plaintiff said he guessed it was all right. Plaintiff brought
the machine to Ulysses. He did not bring it to my place
—he turned across the street and left it standing in the
public square. Plaintiff asked me where he should put the
machine, and said he had fooled with it all he was going
to. I said: 'You ought to have told me yesterday, so I
could have remedied it, or given you assistance if you
needed any, but you told me you was satisfied, and I don't
believe you have a right to return the machine without

41

giving the company a chance to remedy the defects, if there were any.' I told him I would not receive the machine unless he would allow me to send a man there to see if there was a defect in it, according to our contract. Cooper said the machine was all right, and asked an opportunity to show it, but Schroeder said he couldn't' have it; that he didn't want to try it for the reason that it might do good work, and he would then have to keep it, and he didn't want the machine under any circumstances. That was July 18th—same day machine was returned. Think he also said then that he had made other arrangements."

J. C. Schroeder, the plaintiff below (defendant in error), in his direct examination, testified as follows :

" I took the machine out from Ulysses on the 11th of July. Just before starting out, Mr. Reynolds called me into his office and asked me how much money and how many notes I wanted to pay for the machine. The machine was $312.50, and I gave him $50 in cash, and one note for $62.50, and another note for $100, and two notes for $100 each. I executed these notes and gave him $50 in money. I took the machine home that day. Reynolds said he would send a man to set the machine up, and he sent Mr. Skinner on the 15th of July. When the machine started he could not make it work. Mr. Skinner couldn't.

" We started the machine in the afternoon.

" My hired man, Mr. Skinner, and Mr. Cooper was present.

" Skinner said it was his business to feed and taffy until Cooper came. Skinner and Cooper fooled around the machine and fingered with it. Sometimes it would bind two or three bundles together. They would whoop and holler, and Mr. Cooper said it was a good machine because it dragged the sheaves into the shock. Loose bundles would come out, and then they would come out all bound together. All the way they made it work was by one man working alongside of it and helping it all the time. Skinner went

home pretty soon—Cooper stayed most all the afternoon, and towards night he got in his buggy and made us a little speech—that we should loosen the tension in the morning when it was damp, and so on—that after it was run a couple of days and the paint wore off, it would run all right.

" The field was in good condition. The next day was Sunday, and me and my hired man tried the machine. I was anxious and wanted it to do good work. The field was in as good a condition as a man could wish for. I could not make the machine work, and next morning I again went to Mr. Reynolds and told him that if he couldn't fix it I would haul it in. On the 17th day of July, I went to the agent at Ulysses and told him myself that it would not work and that he must come out and fix it. He came out and tried to fix it, and made it do any kind but good work. The next day was the fourth day that I had it, and I had but three acres left—my hired man and I tried to work the machine; he drove, and I walked along by the side of the machine, and it did just the same way.

"We suffered about four days with the machine cutting nine acres of barley, and we drawed off the loose barley, which was five loads, that the machine failed to bind. I followed the directions of Skinner, Reynolds, and Cooper. I did all in my power to do what they instructed me to do, and it done just as poor work as it could do.

"When I had the barley cut, I did not unhitch but drove straight to Ulysses, and returned it to Mr. Reynolds. I wanted my notes and money again, and he said I could not unhitch from the machine, but I unhitched, and never hitched to it again. I demanded my notes, but he would not give them to me. They never returned the notes or money."

This testimony of Schroeder was given before that of Skinner, Cooper, and Reynolds, heretofore quoted, and there is no rebutting testimony denying certain admissions

alleged to have been made by him: *First*, testimony of Skinner that "after Cooper had been there awhile Schroeder expressed himself as being satisfied with the working of the machine. When I was about to leave, Schroeder said he thought it would be a good idea for me to stay and learn from a man who knew how to run a machine, as he had got that to running all right as soon as he came"; *Second*, the testimony of Cooper, as follows: "I showed plaintiff how to operate that. He didn't seem to pay much attention to it. He very seldom tried to adjust the machine for short grain. * * * I asked him to get down from the seat—he was driving the machine—and I would explain to him how to adjust the machine, and he said it was like any binder; and I asked him again to get down, but he didn't, and I gave the explanation where he was sitting. I don't think he learned anything, or very little about it, because he could not see. I tried to show him why it bound two bundles together. I showed him the lever to adjust the reel and sickle for long and short grain. He used these conveniences but very little while I was there. The machine did very good work while I was there. It did the poorest work in the short grain. The band being so near the top, by not adjusting the binder, that they fell out loose, leaving the string on the ground. That would have been bound outside of the extremely short grain, had the driver properly adjusted the machine for short grain"; and, *Third*, the testimony of Reynolds, as follows: "The machine did first-class work, and plaintiff expressed himself as satisfied with it. I fixed the knife and Mr. Schroeder complimented me for fixing the machine so quick. It was cutting off the cord too quick when I went there, and for that reason did not bind good. That was all the trouble except the tension needed a little adjustment. The knife was an adjustable one. I was there most of the forenoon. No trouble with the machine after we started it. The machine was capable of doing and did first-class work." *

\*    \*    And on the succeeding day at Ulysses, " Cooper said the machine was all right, and asked an opportunity to show it, but Schroeder said he couldn't have it, that he didn't want to try it for the reason that it might do good work and he would then have to keep it, and he didn't want the machine under any circumstances."

These are specific charges relating to the conduct of the defendant in error in regard to this machine, and of admissions made by him which are not met by him by his sweeping allegation of performance.

If these allegations were untrue, it was in his power to deny them, and having failed to do so, for the purposes of this action they stand admitted.

While the purchaser of the machine may insist that the machine shall fully correspond in every respect with the terms of sale in regard to material, construction, and otherwise, yet when the machine delivered corresponds in all respects with the terms of sale, and performs according to the conditions of the warranty, the purchase will be complete. The law, while it respects the rights of the purchaser, and protects him in the enforcement of his contract, also protects the manufacturer, who bestowed his material labor, and skill in the construction of the machine, in the assertion of his rights. In other words, the law requires good faith on the part of the manufacturer and also of the purchaser. If, therefore, a machine corresponds in all respects with the terms of sale, the purchaser cannot avoid the sale by reason of his change of mind or neglect to operate the machine with diligence and care. That is, his own conduct, inattention, or want of skill cannot be made the basis of a claim of defect in the machine itself.

If these alleged admissions, made by Schroeder, and the allegations that he did not operate the machine properly, are true, the cause of the defects complained of is largely the result of his own conduct. The facts that on the 17th of July he expressed himself to Reynolds as satisfied with

the machine; that he thereafter completed the cutting of his barley, and immediately on such completion returned the machine to Ulysses, and refused to permit Mr. Cooper to give the machine another trial "for the reason that it might do good work, and he would then have to keep it," are strong circumstances tending to show a determination on the part of Schroeder not to keep the machine even if it complied with the terms of warranty.

The preponderance of the evidence is therefore against the verdict.

3d. The plaintiffs in error claim that the defendant in error having commenced to use the machine about 2 o'clock P.M of Saturday, July 15th, and used the same during the remainder of that day and also on the afternoon of the succeeding day, is thereby precluded from rescinding the contract.

It is asserted with much confidence that in law there are no fractions of a day, and that the defendant in error having used the machine during Saturday afternoon, thereby used it for an entire day.

"The word *day*, in law, embraces the entire day; but that a day in law is not divisible, is a mere fiction, only observed for the purposes of justice, and never adhered to when it would work mischief." *Follett v. Hall et al.*, 16 Ohio, 113. The purpose of this provision in the contract was to give the purchaser a fair opportunity to test the machine; he was to have it during an entire day. The word *day* is to be understood with reference to the usage of farmers in the working of such machines.

The objection therefore is untenable.

4th. Considerable stress is laid by the plaintiffs in error on the fact that no demand was made for the notes in question before bringing suit. Where, however, the terms of sale are that in case the machine fails to comply with the conditions of the warranty, and may be returned to the seller, or his agent, the return of the machine, if duly

made, and notice to the agent, are a sufficient demand of the notes.

The notes are delivered on conditions merely that the machine will fill the requirements of the contract, the delivery not being absolute. It was the duty of the agent, therefore, if the machine was properly returned (but not otherwise) to return the notes. This ground of error is therefore not well taken.

As there must be a new trial, it will not be necessary to consider the other assignments of error.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.